SUPERLINE TRANSPORTATION COMPANY, INC. *vs.* MY BREAD
BAKING COMPANY
(and a companion case[1]).

Bristol.   December 10, 1965.—March 7, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & SPIEGEL, JJ.

*Carrier*, Contract carrier, Common carrier.   *Practice, Civil*, Exceptions:
what questions open, exception to finding.

In an action heard on an auditor's report, containing all the material subsidiary facts, by a judge of the Superior Court who adopted the auditor's findings, an exception to the judge's general finding presented the
question of law whether it was permissible on the subsidiary facts.
[365]

A carrier acting as a contract carrier toward a particular shipper, but
without a contract carrier's permit from the Department of Public Utilities, is not to be deemed to be a common carrier because it is licensed
and has rates on file as such, nor is it entitled to recover from the shipper
in accordance with those rates.   [368]

Under the provisions of G. L. c. 159B, if a common carrier of property by
motor vehicle, dealing as such, charges less than its tariff filed with the
Department of Public Utilities, or if a contract carrier, dealing as such,
charges less than its filed schedule of rates, each may recover the difference from its shipper.   [368]

A carrier of property by motor vehicle, which first carried goods for a
certain shipper after the carrier, to the knowledge of the shipper, had
become a common carrier and which carried the goods pursuant to an
agreement with the shipper establishing a fixed price for a continuing
business relationship, acted as a contract carrier respecting the shipper
and was not entitled to recover from him the difference between the
rates paid by him under the agreement and higher common carrier
rates filed by the carrier with the Department of Public Utilities.   [369–
370]

TWO ACTIONS OF CONTRACT.   Writs in the Superior Court
dated April 24, 1962.

The actions were heard by *Sgarzi*, J.

*Malcolm Jones* (*Vieri G. Volterra* with him) for Superline Transportation Company, Inc.; *Gerald Franklin*, for
C. G. Bowman, Inc., also with him.

*Charles R. Desmarais* for the defendant.

SPALDING, J.   These are two actions of contract against

[1] The companion case is C. G. Bowman, Inc. *vs.* My Bread Baking Company.

the same defendant (My Bread) to recover the difference
between the rates prescribed by the Department of Public
Utilities (department) and the amounts actually received.
Both cases were referred to an auditor whose findings were
not to be final.   Thereafter the cases were heard by a judge
on the auditor's reports and some documentary evidence.
Since this evidence did not control or affect the auditor's
findings in any way it need not concern us.   The cases in
effect were tried on the reports of the auditor, whose find-
ings the judge adopted.   On the basis of these findings the
judge found for the defendant in the action brought by
C. G. Bowman, Inc. (Bowman), and for the defendant on
counts 1 and 3 in the action brought by Superline Trans-
portation Company, Inc. (Superline).[2]

Of the numerous exceptions taken by the plaintiffs we are
concerned only with the exceptions to the judge's general
findings for the defendant in the Bowman case and for the
defendant on counts 1 and 3 in the Superline case.   Since
all the material subsidiary facts have been found these ex-
ceptions present the question of law whether the general
findings were permissible on the subsidiary facts.   See
*Leshefsky* v. *American Employers' Ins. Co.* 293 Mass. 164,
166–167; *Muir Bros. Co.* v. *Sawyer Constr. Co.* 328 Mass.
413, 415.   Thus all questions of substance argued by the
plaintiffs are before us.

The facts pertaining to the Bowman case are these.
Prior to its incorporation in March, 1960, My Bread was a
sole proprietorship owned by Joseph P. Duchaine.   Some-
time in 1948, Duchaine and Bowman entered into an agree-
ment for the delivery of 100 pound bags of flour from the
freight yard to Duchaine's place of business, a distance of
approximately one mile.   Although the auditor's report is
not explicit on this point, it would appear that the rate
agreed upon was the commodity tariff which the plaintiff
had on file with the department, pursuant to a power of

---

[2] The judge found for Superline on the second count in the sum of $1,236.48.
This sum represents the amount due for items transported during the latter
part of December, 1961, at ten and one-half cents per bag, which had not
been paid. Although Superline excepted to this finding on the ground of
inadequacy, it does not now press the exception.

attorney appointing the New England Motor Rate Bureau, Inc. its agent for that purpose.[3] From time to time these tariff rates, and with them, apparently, the cost to Duchaine of Bowman's services, were changed. In December of 1959, Duchaine was notified that, "due to increased costs," Bowman was going to raise the price of transportation from eleven cents to twelve cents per 100 pound bag. Bowman, having been told by Duchaine that he "would have to get someone else," agreed to continue carrying the flour at eleven cents. Bowman did so until May, 1961, when dealings between the two parties terminated because of a contemplated increase in the rate to fifteen cents.

During the period in which Bowman had a twelve cent rate on file and was charging the defendant eleven cents, from January 4, 1960, to May 22, 1961, Bowman delivered 302,135 bags of flour to the defendant. Bowman here seeks $3,021.35, the additional sum it would have received had charges been made in accordance with the filed rates.

About the time that Bowman was terminating its relationship with My Bread, Superline inquired into the possibility of performing these services for the defendant. Informed that Bowman had been receiving ten and one-half cents per bag and that the arrangement was terminating because of a rate increase, Superline agreed to transport the flour for ten and one-half cents. The parties dealt with each other on this basis from June 12, 1961, to December 29, 1961, during which time Superline handled a total of 129,590 bags. "As each shipment was delivered, a freight bill . . . was signed by the defendant's employee, Martel. On the bottom of the freight bill there is printed, 'Received subject to the classifications and tariffs in effect on the date of receipt by the carrier of the property described in the original bill of lading.' "

During this period, Superline had no commodity tariff on file covering the transportation of flour, but operated instead "under so-called class rates under authority of a power of attorney issued to the New England Motor Rate

---

[3] The auditor found that the designation of an agent by power of attorney was authorized by the department's rules and regulations.

Bureau, Inc.'' From June 12 to November 7, 1961, the class rate applicable to Superline was twenty cents per hundred weight. From November 7 to December 16, 1961, when Superline filed a local commodity rate pertaining to flour of fifteen cents, the applicable class rate was twenty-two cents. The amount sought by Superline, apart from count 2, reflects the difference between the total of the various applicable commodity and class rates and the sum actually paid by the defendant over the course of their dealings.

In both cases, the auditor found that while transporting for the defendant, neither plaintiff had either a contract or a schedule of contract rates on file with the department, and neither had a permit from the department to operate as a contract carrier. The auditor also found that all of the parties acted in good faith and that there was no "design or scheme . . . to circumvent the statutes or rules and regulations of the . . . [department]''; that the defendant knew that the plaintiffs were common carriers, but was never advised of the tariffs which they had on file with the department; and that both actions were instituted ''as a direct result of an investigation by the D.P.U. [and] under threat of a hearing seeking to suspend or revoke . . . [the plaintiffs'] common carrier certificate[s].'' The auditor concluded in each case, ''[t]hat the nature and character of the business between the plaintiff and defendant and the circumstances under which the transportation was furnished, was that the plaintiff was acting as a contract carrier.''

The correctness of the decisions below turns upon whether the subsidiary findings in each case warranted the conclusion that the plaintiff was acting as a contract carrier, as distinct from a common carrier, in its dealings with the defendant.

The plaintiffs argue that since they were licensed as common carriers only, with rates on file applicable to the work they were doing for the defendant, they could not, as matter of law, be regarded as anything other than common car-

riers. We have encountered this argument in previous cases arising under G. L. c. 159B. It is now settled that a carrier may be acting as a contract carrier in a particular transaction even though he does not possess a contract carrier's permit from the department, and that, in such circumstances, the fact that the carrier is a licensed common carrier, with rates on file applicable to the type of work being performed, does not entitle him to recover in accordance with those rates. *First Natl. Stores Inc.* v. *H. P. Welch Co.* 316 Mass. 147. *Rugg* v. *Davis,* 320 Mass. 388, 390–391. *Mt. Tom Motor Line, Inc.* v. *McKesson & Robbins, Inc.* 325 Mass. 45, 50–51. As these cases point out, the statute contemplates that a carrier may serve in one or both of these capacities. The statute also provides sanctions against carriers which act in an unauthorized manner, as have the plaintiffs here. G. L. c. 159B, § 21.[4] It is clear that if a common carrier, dealing as such, charges less than its filed tariff, or if a contract carrier, dealing as such, charges less than its filed schedule of rates, each may recover the difference. *Papetti* v. *Alicandro,* 317 Mass. 382, 389. See G. L. c. 159B, §§ 6, 6A, 7. There is nothing in the statute to suggest, however, that one acting as a contract carrier, but without a permit to do so, shall be deemed to be a common carrier because it is licensed and has rates on file as such. *First Natl. Stores Inc.* v. *H. P. Welch Co.* 316 Mass. 147, 150. *Mt. Tom Motor Line, Inc.* v. *McKesson & Robbins, Inc.* 325 Mass. 45, 50.

We turn to the question whether the subsidiary findings in the cases at bar warranted the conclusions that, vis-à-vis the defendant, the plaintiffs were acting as contract carriers. The auditor's conclusions in this regard were adopted by the judge, and they must stand if supported by the subsidiary findings. As to where the line is drawn between transportation arrangements which characterize a common carrier relationship and those which import that of a contract carrier, there is no precise answer. Chapter

---

[4] These sanctions include the imposition of a fine and a possible revocation of the carrier's certificate, permit or license.

159B, § 2, distinguishes a "common carrier" from a "contract carrier" by virtue of the fact that the former transports property "for the general public" whereas the latter operates "under special and individual contracts or agreements." This distinction is reiterated in the cases cited above. Here, however, we are concerned not so much with classifying each carrier as with classifying the relationship each enjoyed with this defendant. Faced with a similar problem in the *Mt. Tom Motor Line* case, we said: "On one hand, there is hardly any occasion to make an executory contract with a common carrier as he is bound to furnish transportation in accordance with the provisions of the statute and to demand and collect the rates filed with the department, G. L. (Ter. Ed.) c. 159B, §§ 6, 19, while on the other hand there is necessity for such a contract if the transportation is to be performed by a special or contract carrier. . . . The executory arrangement which the plaintiff made with the defendant sheds some light upon the question whether the plaintiff was acting as a common or contract carrier." 325 Mass. 45, 49. While the making of an executory arrangement may not be conclusive on the issue of whether a carrier is acting as a common or contract carrier, we are of opinion that where, as here, the parties entered into an agreement establishing a fixed price to cover what the auditor and judge could have found was regarded by all parties as a continuing business relationship, there was sufficient basis for the conclusions that the plaintiffs acted as contract carriers.

The plaintiffs seek to distinguish the present cases from *Mt. Tom Motor Line, Inc.* v. *McKesson & Robbins, Inc.* 325 Mass. 45, and *Rugg* v. *Davis,* 320 Mass. 388, by pointing out that in those cases there was a preëxisting relationship between the shipper and the carrier prior to the carrier's obtaining a common carrier certificate, and that the shipper had no knowledge of the carrier's changed status. Such factors doubtless would be relevant as to whether a shipper had knowingly or fraudulently received a rebate or concession in violation of § 6A or § 19 of c. 159B. We fail to see,

however, how these factors bear upon the precise issue of whether the plaintiffs were acting as common or as contract carriers in their dealings with the defendant.

The cases at bar are governed in all essential particulars by our decision in the *Mt. Tom Motor Line* case.

In each case, let the entry be

*Exceptions overruled.*