**In re PALMER TRUCKING CO., INC., Debtor.**

**David J. NOONAN, Trustee of the Debtor's Estate of Palmer Trucking Co., Inc., Plaintiff,**

**v.**

**CELLU TISSUE CORPORATION, CST Office Products, Inc., Hartford Cooperage Co., Inc. a/k/a New England Container, Luxo Lamp Corporation a/k/a Luxo Corporation, Mailrite, Inc., Creative Bronze, Inc., and Performance Polymers, Inc., Defendants.**

**Bankruptcy Nos. 93–40834–HJB, 95–4317.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 23, 1996.

David J. Noonan, Trustee.

Claudia J. Reed, Springfield, MA, for the Trustee.

Frank J. Weiner, Canton, MA, for CST Office Products, Inc.

### *MEMORANDUM OF DECISION*

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is a "Motion for Summary Judgment, or Alternatively, Motion for Partial Summary Judgment, Stay and Referral to the Massachusetts Department of Public Utilities" (the "Motion") filed by CST Office Products, Inc. ("Defendant" or "CST"), one of the defendants in the instant adversary proceeding. Through his complaint, David J. Noonan, the Chapter 7 Trustee in Bankruptcy ("Plaintiff" or the "Trustee") of Palmer Trucking Co., Inc. (the "Debtor"), seeks to collect from CST the difference between the amount paid by CST for intrastate transportation services rendered by the Debtor and the rate established by the Debtor's published tariff (the "undercharge claim").[1]

### I. *Facts*

The following facts are not in material dispute.

The Debtor was a motor carrier engaged in both the interstate and intrastate trans-portation of property. As a common carrier, the Debtor was required by Mass.Gen.L. ch. 159B, § 6 to publish and file with the Commonwealth of Massachusetts Department of Public Utilities (the "MDPU") tariffs containing all rates charged by the Debtor for the intrastate transportation of property. More importantly, Mass.Gen.L. ch. 159B, § 6A required the Debtor to charge its customers only those tariff rates which were on file with the MDPU. The Debtor did file its tariff rates with the MDPU, but failed to restrict itself to charging only those rates. Between October 1, 1992 and April 6, 1994, the Debtor charged several of its customers, including CST, rates which were less than those rates filed with the MDPU.

On March 24, 1993, the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On August 23, 1994, the Chapter 11 case was converted to a Chapter 7 case. The Trustee commenced this adversary proceeding on October 12, 1995, seeking to collect the sum of $157,316.95 [2] from CST, representing the difference between the rate paid by CST for the Debtor's services on intrastate shipments and the rates which were filed with the MDPU at the time the services were rendered. CST subsequently filed the instant motion to which the Trustee objected. After a hearing thereon, the Court took the motion under advisement.

### II. *Positions of the Parties*

CST asserts that § 601(c) of the Federal Aviation Administration Authorization Act of 1994 (the "FAAAA")[3] preempts all state law related to the prices, routes or services of motor carriers; and, therefore, the Trustee's undercharge claim is barred. In the alternative, CST claims that a statute of limitations contained in the rules and regulations of the New England Motor Rate Bureau, Inc., a rate tariff publishing agent, precludes the Trustee's undercharge claim. CST also

---

1. The Trustee has also filed other adversary proceedings in which identical issues are raised and which the Court has taken under advisement. *See* Adversary Proceeding No. 95–4220; Adversary Proceeding No. 95–4297; and Adversary Proceeding No. 95–4298.

2. At the hearing on the Motion, the Trustee represented that its claim was, based on further investigation, overstated, and probably approximates $50,000. (Tr. at 31–32.)

3. Pub.L. 103–305, 108 Stat. 1569, 1605 (codified as amended in 49 U.S.C. § 11501(c)).

maintains that, to the extent that its requests for summary judgment are denied, the MDPU has primary jurisdiction. Therefore, CST urges the Court to stay these proceedings and refer any issues involving the reasonableness of the Debtor's rates to the MDPU for determination. Finally, CST argues that the matters raised by the Trustee's complaint are non-core under 28 U.S.C. § 157; and, therefore, this Court's role is limited to the submission of proposed findings of fact and conclusions of law to the district court. *See* 28 U.S.C. § 157(c)(1).

The Trustee argues that the FAAAA should not be retroactively applied to bar claims based on shipments which occurred before the January 1, 1995 effective date of the FAAAA. In addition, the Trustee maintains that the FAAAA is inapplicable in the instant case. The Trustee interprets the statute to prohibit only actions by entities which constitute a State, political subdivision of a State, or political authority of 2 or more States; and the Trustee is not such an entity. The Trustee also contends that summary judgment is improper because of the existence of disputed material issues of fact, including the amount of the Trustee's's claim, whether CST paid for each shipment at issue, and whether the Debtor was a participant in the tariffs published by the New England Motor Rate Bureau, Inc. Finally, the Trustee asks that if the Court finds that the undercharge claim is preempted by the FAAAA, the Trustee be allowed to amend his complaint to include a claim for breach of contract based on the bills of lading that exist for each shipment at issue.

**4.** Mass.Gen.L. ch. 159B, § 6A provides:

No common carrier by motor vehicle shall charge, demand, collect or receive a different compensation for transportation or for any service in connection therewith between the points enumerated in such tariffs than the rates and charges specified in the tariffs in effect at the time; and no such carrier shall refund or remit in any manner or by any device, directly or indirectly, or through any agent or broker or otherwise, any portion of the rates or charges so specified, or extend to any person any privilege or facility for transportation except such as are specified in its tariff.

No shipper, consignee or any other person, in connection with any transportation opera-

## III. *Discussion*

### A. Summary Judgment

■ Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Fed.R.Bankr.P. 7056, the Court may award summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In the instant case, the Trustee and CST agree that the provisions of Mass.Gen.L. ch 159B, § 6A constitute a law related to the prices, routes, and services of motor carriers. Both parties agree that the threshold issue which must be determined—whether the FAAAA preempts state law actions commenced *after* the January 1, 1995 effective date of the FAAAA based on intrastate shipments which occurred *before* January 1, 1995—is a purely legal issue. The facts claimed by the Trustee to be disputed are not material to the resolution of this issue.

### B. The Filed Rate Doctrine

Mass.Gen.L. ch. 159B, § 6A [4] (the "Massachusetts Rate Statute") codifies a "highly esoteric and counter intuitive" [5] legal principle known as the filed rate doctrine. That

tion subject to this chapter, shall knowingly induce or persuade or enter into any contract or agreement with any common carrier by motor vehicle to make a rebate or refund of any lawful transportation charges, or to give up or repay any part of any payment to which he is lawfully entitled, or to render a bill for an amount different from those proper under the rates and charges established under the provisions of this chapter and contained in the published tariffs legally on file with the department. . . .

**5.** Wayne Johnson, *The Negotiated Rates Act of 1993: Congress Curtails Undercharge Litigation in Bankruptcy by Amending the Filed Rate Doctrine*, 68 Am.Bankr.L.J. 319, 349 (1994).

doctrine was first created at the federal level to regulate interstate transportation and was later adopted by many states with respect to intrastate transportation.[6]

■ The filed rate doctrine requires a motor carrier to charge and collect only those rates contained in tariffs filed with state regulatory agencies. The carrier may not charge or receive compensation different than the rate specified in the tariff. In addition, the carrier's customers (known as shippers) are responsible for paying the filed rate and thus are liable for any difference between the filed rate and the rate paid.[7] Undercharge claims, such as the one at issue in the instant case, are claims for the difference between what a motor carrier was legally required to charge its customers under the filed rate doctrine, and the lower rates that were actually charged and collected.

■ Increased competition among motor carriers due to the deregulation of the industry at the interstate level during the 1980s resulted in widespread violations of the filed rate doctrine. *See* Johnson, *supra* note 5, at 341–45. Motor carriers began discounting rates yet failed to file these new rates. *Id.* Predictably, the heightened competition in the industry resulted in an increase in bankruptcy filings among motor carriers. *Id.* at 344. These bankruptcies spawned undercharge suits by trustees seeking to increase the assets of the estate. *See id.* at 345. This "undercharge crisis" culminated with the passage of the Negotiated Rates Act of 1993 (the "NRA"),[8] which attempted to resolve the majority of the undercharge claims. *See* Johnson, *supra* note 5, at 348 & 354–55. However, the NRA applies only to interstate transportation. *See* 49 U.S.C. § 13709(a)(1). The Trustee seeks to enforce the filed rate doctrine at the intrastate level. The application of the FAAAA, subsequently passed by Congress to resolve intrastate undercharge claims is, therefore, the critical inquiry.

## C. Application of the FAAAA

The FAAAA provides in relevant part that "... a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier...." 49 U.S.C. § 14501(c)(1). The Trustee argues that because *he* is not a State, political subdivision of a State, or political authority of two or more States, the FAAAA is inapplicable to his undercharge claim against CST.

The language of the FAAAA is broad and preempts a wide range of state regulations. *Kelley v. United States,* 69 F.3d 1503, 1508–09 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1566, 134 L.Ed.2d 665 (1996); *St. Johnsbury Trucking Co., Inc. v. Mead Johnson & Johnson (In re St. Johnsbury Trucking Co., Inc.),* 199 B.R. 84, 87 (S.D.N.Y. 1996); *see Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (virtually identical language in § 1305(a)(1) of the Airline Deregulation Act of 1978 was found to "express a broad preemptive purpose").

In enacting the FAAAA, Congress specifically found that:

(1) the regulation of intrastate transportation of property by the States has

(A) imposed an unreasonable burden on interstate commerce;

(B) impeded the free flow of trade, traffic, and transportation of interstate commerce; and

(C) placed an unreasonable cost on the American consumers; and

(2) certain aspects of the State regulatory process should be preempted.

Pub.L. 103–305, § 601(a), 108 Stat. 1569, 1605 (1994).

■ In light of both the broad preemption language and the purpose of the FAAAA,

---

6. For a thorough and excellent explanation of the history of the filed rate doctrine, see Johnson, *supra* note 5.

7. "If a common carrier charges less than the filed tariff, the carrier may recover the difference." *Superline Transp. Co. v. My Bread Baking Co.,* 214 N.E.2d 885, 888, 350 Mass. 364, 368 (1966).

8. Pub.L. No. 103–180, 107 Stat. 2044 (codified in scattered sections of 49 U.S.C.).

this Court finds the Trustee's interpretation to be an overly restrictive reading of the FAAAA. Limiting the preemption provision only to those actions instituted by a State would render the preemption provision meaningless. In response to an identical argument by a trustee in *Salisbury v. S.B. Power Tool (In re Indus. Freight Sys., Inc.)*, a case before the bankruptcy court in the Central District of California setting forth the precise issue before this Court, Bankruptcy Judge Robles concluded "[t]his court cannot enforce actions based upon the filed rate doctrine any more than the States can enforce such actions ... To do so would create a judicial end-run that would render the FAAAA a nullity." 191 B.R. 825, 831 (Bankr.C.D.Cal.1996) (appeal pending). This Court agrees.

Similarly, the Trustee argues that the FAAAA was intended to apply only to motor carriers with operating businesses; and therefore, undercharge claims, which are almost exclusively brought by carriers who are no longer operating, or by trustees in bankruptcy, are not within the scope of the FAAAA. This Court disagrees. Neither the language nor the legislative history of the statute contain any such distinction between operating and non-operating motor carriers. *See id.* at 830–31 (court rejected argument that FAAAA applies only to carriers currently in business). Instead, as previously discussed, both the language and purpose of the FAAAA support broad application of the preemption provision.

### D. Retroactive Application of the FAAAA

The FAAAA became effective on January 1, 1995. The Trustee's undercharge claim, filed on October 12, 1995, relates to shipments which occurred between October 1, 1992 and April 6, 1994.

The Trustee argues that the FAAAA does not apply to shipments made prior to the FAAAA's effective date because the FAAAA does not explicitly provide for retroactive effect. Therefore, the statute cannot preempt his undercharge claim based on shipments which occurred prior to January 1, 1995. CST, on the other hand, contends that the FAAAA does not speak to when the subject shipments were made. Rather the FAAAA expressly prohibits any *enforcement* of the filed rate doctrine after January 1, 1995. Therefore, the application of the FAAAA to bar the Trustee's undercharge claim was prospective as to claims not yet the subject of suit. CST reasons that the FAAAA preempts only the present enforcement of the filed rate doctrine, regardless of whether the underlying claims are based on past, present, or future shipments.

To date, this Court has located only two other decisions addressing the preemption issue. *St. Johnsbury Trucking*, 199 B.R. 84; *Industrial Freight*, 191 B.R. 825. Both courts held, in similar circumstances, that the undercharge claims were barred by the FAAAA, and both adopted the reasoning set forth by CST. Both courts ground their rulings on the time when the undercharge action was commenced as opposed to the time when the shipments were made. *See* 199 B.R. at 87–88; 191 B.R. at 829. Like CST, both courts reasoned that since the FAAAA prohibits the enforcement of state law incorporating the filed rate doctrine, the relevant time frame is when the undercharge action was filed; not when the shipments occurred. *See id.* Since in both cases, the actions were not filed until after the effective date of the FAAAA, the courts reasoned that the state laws upon which the claims were based had already been preempted by the time the claims were filed. *Id.* As a result, both courts concluded that no retroactivity issue is invoked by applying the FAAAA to actions brought after January 1, 1995 based on pre-enactment shipments. *Id.*

The Trustee would quarrel with the holdings of *St. Johnsbury Trucking* and *Industrial Freight*, by suggesting that they are at odds with the U.S. Supreme Court decision of *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In *Landgraf*, the Court declined to extend the right to seek compensatory damages, afforded by the Civil Rights Act of 1991, to the plaintiff of a sexual harassment case on appeal at the time of the enactment of the statute. The court ruled that the application of such a change in the law was impermissi-

bly retroactive. *Id.* at — – —, 114 S.Ct. at 1506–07. Because the *Landgraf* case was already in the appellate stage when the right to claim compensatory damages was enacted, the court's holding related specifically to the application of a federal statute enacted after an action has been commenced. In this respect, the instant case is readily distinguishable from *Landgraf,* as the FAAAA was enacted well before the commencement of the Trustee's action. Both the *St. Johnsbury Trucking* and *Industrial Freight* cases emphasized that important difference and this Court agrees with their analysis. *See* 199 B.R. at 87–88; 191 B.R. at 828.

■ However, this Court is not satisfied with merely distinguishing *Landgraf.* Rather, *Landgraf* is instructive on how the issues in the instant case should be resolved. In *Landgraf,* the Court set forth a variety of tests, exceptions, and policy guidelines available to courts in order to determine whether a statute operates retroactively; whether Congress intended retroactive application; and whether to give retroactive application in the absence of a clearly stated Congressional intent. Having examined the Court's language, this Court is satisfied that employing the preemption provisions of the FAAAA to bar the Trustee's undercharge claim in this case does not constitute the retroactive application of a federal statute.

As is eloquently stated in *Landgraf:*

A statute does not apply "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment ... or upsets expectations in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagree-

ment in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have "sound ... instinct[s]," [citation omitted] and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

⋅     ⋅     ⋅     ⋅     ⋅

Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress has made clear its intent ... the presumption against statutory retroactivity has been consistently explained by the unfairness of imposing new burdens on persons after the fact.

*Id.* at — – —, 114 S.Ct. at 1499–1500.

With the benefit of the Supreme Court's guidance, this Court returns to the issues at hand. The first inquiry is whether the language of § 601(c) of the FAAAA provides a plain meaning permitting or precluding retroactive application of the statute. *Landgraf,* 511 U.S. at —, 114 S.Ct. at 1505; *see United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The Trustee concludes that the provision that the act "shall take effect upon January 1, 1995" is an express indication that the act was not intended to have retroactive effect, but was intended to apply prospectively only to *events* occurring after January 1, 1995. CST, on the other hand, argues that the language prohibiting *enforcement* of state law bars any suits filed after January 1, 1995 regardless of when the underlying events transpired.

■ It would be easier by far if this Court could find in the language of § 601(c) a plain meaning, as did the *Industrial Freight* court. 191 B.R. at 829. But this Court finds the meaning anything but plain and cannot draw any conclusions as to retroactivity from the language of § 601(c) alone.[9] In addition, the

---

9. Not unexpectedly, CST finds the requisite plain meaning in the statute. But, as has been recently noted in this Circuit, "[w]hen ambiguity is identified, a dispute about a statute's or regula-

tion's proper construction cannot be resolved simply by placing the gloss of 'plain meaning' on one competing interpretation." *Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1 (1st Cir.1996)

legislative history of the FAAAA contains no discussion of congressional intent with respect to retroactive application of the statute. *See* H.R.Conf.Rep. No. 103–677, 103d Cong., 2nd Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715; S.Rep. No. 103–181, 103d Cong., 1st Sess. (1993); H.R.Rep. No. 103–240, 103d Cong., 1st Sess. (1993), *reprinted in* 1994 U.S.C.C.A.N. 1676. Therefore, this Court must delve deeper to examine what rights are really at issue.

In *Landgraf,* the Supreme Court instructed that the identification of retroactive application must focus on the "nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event," but without imposing a burden on "private rights." 511 U.S. at ———–———, 114 S.Ct. at 1499–1500. With this guideline in mind, the retroactivity issue comes into focus. This clearer picture is achieved by remembering that the Massachusetts Rate Statute is not about the Debtor or the Trustee. The statute was not passed to afford a benefit to motor carriers. It was promulgated to effect a then legitimate goal of the Commonwealth's police power, that is, the regulation of intrastate commerce. It is true that under the Massachusetts Rate Statute, carriers were permitted to collect the undercharge. However, that was merely the methodology selected by the Commonwealth to effectuate its police power goals. The Commonwealth could just as easily have made the undercharge transaction a crime punishable by imprisonment, or exacted a fine payable to the state coffers. That the Commonwealth and many other states chose instead to afford the colluding carrier a right of action against the shipper makes the carrier no more than an incidental beneficiary of the intended regulatory goal. To now claim that the removal of that cause of action under the statute from the carrier who knowingly participated in its violation is some sort of unconstitutional "taking," turns the statutory scheme inside out.

■ The purpose of the Massachusetts Rate Statute was never about providing a private right to individual carriers. It was about the effectuation of goals of the Commonwealth. When Congress passed the FAAAA, it overrode the Commonwealth's statutory scheme *prospectively,* rather than took away rights from carriers retroactively. As the *Landgraf* court noted, "[e]ven absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at ———, 114 S.Ct. at 1501.

■ In view of the foregoing, this Court believes that the FAAAA preempts the enforcement of the Massachusetts Rate Statute, irrespective of the date of the shipments. The Trustee's undercharge claims are therefore barred.

### E. The Trustee's Breach of Contract Claim

The Trustee requests that, if the Court finds that the FAAAA preempted his undercharge claim, he be allowed to amend his complaint to include a cause of action for breach of contract based upon the bills of lading for each shipment. The Trustee suggests that somehow those bills of lading incorporate the tariffs. However, the bills of lading have not been provided and the Court is unable to make any determination as to the provisions of the alleged contracts.

Nevertheless, the Court is skeptical of this argument and finds it hard to understand how there can be a breach of contract action when CST paid the entire amount which was negotiated, agreed to, and charged by the Debtor. Furthermore, the court in *Industrial Freight* rejected a similar argument in that case, stating "[t]hrough the guise of a common law cause of action for breach of contract, the Trustee is attempting to resuscitate the filed rate doctrine imposed by state regulation, not its own agreement with shippers. This is what the [FAAAA] specifically prohibits." 191 B.R. at 831. Nevertheless,

(quoting *Massachusetts v. Blackstone Valley Elec. Co.,* 67 F.3d 981, 986 (1st Cir.1995)). This Court reiterates that "[m]eaning is always plain to the proponent of an interpretation." *In re Legowski,* 167 B.R. 711, 714 n. 9 (Bankr.D.Mass.1994).

the Trustee argues that a breach of contract action is possible because of an analogous decision in *American Airlines, Inc. v. Wolens*, —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (decided under the Airline Deregulation Act of 1978).

Notwithstanding this Court's skepticism, the issue is not now before the Court. Fed.R.Civ.P. 15(a) strongly suggests that leave to amend be "freely given." This Court should not deal with the issue in the abstract. If the Trustee thinks he can overcome the Court's reservations, he may amend his complaint to include a cause of action for breach of contract.

### F. Determination of Whether the Instant Proceeding is Core or Non-core Pursuant to 28 U.S.C. § 157

Finally, the parties contest this Court's jurisdiction to finally determine the issues raised in the Trustee's complaint. The Trustee has characterized his Complaint as one "to compel turnover of property"[10] and argues that this Court has core jurisdiction to finally resolve the issues pursuant to 28 U.S.C. § 157(b)(2). (Compl. ¶ 1.) In its answer, CST "denies the allegation that this is a core proceeding and CST does not consent to the entry of final orders or judgment by the Bankruptcy Judge." (Answer ¶ 1.)

28 U.S.C. § 157 sets forth the parameters of this Court's core and non-core jurisdiction. If a matter is deemed core (or if the matter is non-core but the parties have consented to the entry of final orders by the bankruptcy court), a bankruptcy court may enter a final order or judgment, subject to review by the district court or the Bankruptcy Appellate Panel, pursuant to 28 U.S.C. § 158. If the matter is non-core, the bankruptcy court may hear the proceeding, but may not enter a final order or judgment. *See* 28 U.S.C. § 157(c)(1). The jurisdiction of the court is limited to submitting proposed findings of fact and conclusions of law to the district court. *Id.* The district court review of those findings is de novo. *Id.* The district court alone is authorized to enter a final order or judgment in a non-core matter.

Determination of what is core and what is non-core has not always been easy. Generally speaking, "a procedure is core ... if it invokes a substantive right provided by title 11 or if it is a procedure that, by its nature, could arise only in the context of a bankruptcy case." *Ralls v. Docktor Pet Ctrs., Inc.*, 177 B.R. 420, 424 (D.Mass.1995) (citation omitted). Although § 157(b) provides a list of non-exhaustive examples of core proceedings, even this list in several instances is not a model of specificity.[11]

The instant case is complicated by the fact that some of the undercharge claims relate to shipments made prepetition, while others relate to shipments made after the filing of the Chapter 11 case. The analysis applicable to each is different. The leading case in this Circuit is *Arnold Print Works, Inc.*, 815 F.2d 165. In that case, the court held that an action by a debtor in possession to collect an account receivable arising out of a *postpetition* contract was a core proceeding. *Id.* at 168. Furthermore, the court noted that "the fact that a claim in a bankruptcy matter raises issues of state, rather than federal, law does not by itself determine that it is non-core, rather than core." *Id.* at 169; *see* 28 U.S.C. § 157(b)(3).

Not cited by the parties, but certainly relevant here, is the *Docktor Pet Centers* case.

---

10. Presumably to boost himself into an acceptable § 157(b) category, the Trustee characterizes his complaint as one seeking the turnover of property, rather than the collection of a debt. That characterization is inaccurate. The collection of a debt due the estate "cannot be considered a turnover of property so long as there is some doubt as to the defendant's liability." *Mec Steel Bldgs., Inc. v. San Lorenzo Constr. Corp. (In re Mec Steel Bldgs., Inc.*, 136 B.R. 606, 609 (Bankr.D.P.R.1992) (citing cases). *But see Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.)*, 815 F.2d 165, 168 (1st Cir.1987)

("One can imagine arguments suggesting that [a postpetition action to collect a debt] falls within other provisions [of § 157(b)] as well. *See, e.g.,* 28 U.S.C. § 157(b)(2)(E) ('orders to turn over property of the estate')").

11. *Compare* § 157(b)(2)(A) ("matters concerning the administration of the estate") *and* § 157(b)(2)(O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship ...").

In that case, Chief Judge Tauro was faced with claims arising from *both* pre and postpetition accounts receivable, as well as pre and postpetition breaches of prepetition franchise agreements. The court distinguished the *Arnold Print Works* case, noting that in *Arnold Print Works* all of the operative events occurred postpetition and, therefore, "the cause of action arose during and concerned the administration of the estate." *Docktor Pet Centers,* 177 B.R. at 426. In *Docktor Pet Centers* the relationship between the parties began well before the bankruptcy case, while in *Arnold Print Works* the contract under which the debt arose itself arose postpetition. *Id.* at 426 n. 7. Therefore, the contract in *Arnold Print Works* grew out of efforts to manage the bankruptcy estate. *Id.* Finally, Judge Tauro cautioned that a court should avoid characterizing a proceeding as core if to do so would raise constitutional problems. *Id.* at 427 (quoting *In re Castlerock Properties, Inc.,* 781 F.2d 159, 162 (9th Cir.1986)). In so doing, Judge Tauro "echoed" a concern raised by Judge Young in *Kwiat v. Doucette,* 81 B.R. 184, 192 (D.Mass.1987) that too expansive a reading of § 157(b)(2)(*O* ) was inappropriate and might create constitutional issues similar to those raised in the case of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).[12] *Docktor Pet Centers,* 177 B.R. at 426–27.

This Court agrees with Chief Judge Tauro that the fact patterns of *Docktor Pet Centers* and *Arnold Print Works* are readily distinguishable. However, the Court also notes decidedly different themes presented by the two decisions. The *Arnold Print Works* court urged an expansive interpretation of § 157(b). 815 F.2d at 168 ("... the legislative history of the new statute indicates that Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits"). Conversely, the *Docktor Pet Centers* case urges caution. 177 B.R. at 427.

This Court has decided to follow *Docktor Pet Centers,* not necessarily out of caution (although caution is never bad advice), but because of that case's persuasive criticism of

the case of *Associated Grocers, Inc. v. Tempora Corp. (In re Associated Grocers, Inc.),* 97 B.R. 39 (Bankr.D.Colo.1988). In the *Associated Grocers* case, the debtor in possession sought to recover both pre and postpetition accounts receivable. In order to resolve the jurisdictional dilemma, the court severed the count seeking the collection of the prepetition accounts receivable. In commenting on the case, Judge Tauro noted:

> Although this method is reasonable, the court chooses not to apply it. The severance method, whereby the cause of action would be severed at the petition date, would result with the bankruptcy court issuing final orders and judgment for those causes of action arising after the petition, yet be empowered only to issue proposed findings of fact and conclusions of law for the portion of the breach arising prepetition. This would be an awkward result, considering that the issues of fact and law would most likely be the same for both claims.

177 B.R. at 427 n. 9.

Were this Court to treat the pre and postpetition undercharge claims differently, not only would there be a risk of differing results, but it would also be a waste of judicial resources if portions of the same complaint came to the district court through two different avenues; one by way of § 158 and the other by way of § 157(c)(1). Neither the parties nor the respective courts are benefitted by what this Court agrees would be an "awkward result."

In view of the forgoing, this Court will deem all of the undercharge claims to be non-core proceedings, and at the appropriate time, as set forth below, submit proposed findings of fact and conclusions of law to the district court, together with this supporting Memorandum.

## IV. *Conclusion*

This Court will afford the Trustee twenty (20) days within which to amend his complaint to include one or more counts alleging CST's breach of contract on account of the terms of the bills of lading. Annexed to such

---

12. Judge Tauro might have cited the story of Daedalus and Icarus.

amended counts shall be copies of the bills of lading. CST will be afforded 10 days after service of the amended complaint to file a motion for summary judgment, with supporting affidavit(s) and a memorandum; and the Trustee will be afforded 10 days thereafter to respond. The Court will schedule a hearing only if the Court deems it necessary to resolve the issues presented.

In addition, to further promote judicial economy, the Court will defer transferring this matter, together with its findings of fact and conclusions of law, to the district court, pending this Court's findings and conclusions with respect to the proposed amendment.