In re SPOOKYWORLD, INC., Debtor.

Spookyworld, Inc., Plaintiff,

v.

Town of Berlin, et al., Defendants.

Bankruptcy No. 98–47660.
Adversary No. 98–4257.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 2, 2001.

Carl D. Aframe, Aframe & Barnhill, P.A., Worcester, MA, Stephen J. Gordon, Stephen Gordon & Assoc., Worcester, MA, for Debtor.

Gary S. Brackett, Brackett & Lucas, Worcester, MA, Gerald Fabiaro, Boston, MA, for Defendants.

Richard King, Worcester, MA, United States Trustee.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

The Defendants, the Town of Berlin (the "Town") and various of its representatives and agents (collectively the "Individual Defendants"), request this Court to grant summary judgment with respect to each claim raised by Spookyworld, Inc. (the

"Debtor", or "Plaintiff") in the above titled Adversary Proceeding. The Debtor has asserted claims alleging violation of its civil rights under federal law (42 U.S.C. §§ 1983 and 1985) and Massachusetts law (M.G.L.A. c. 12 §§ 11H and 11I); violation of the automatic stay under 11 U.S.C. § 362; defamation; and interference with its contractual or business relationships.

## I. Summary Judgment as Affected by Core and Non-core Jurisdiction

Before this Court can address the issues implicated in the Defendants' summary judgment motion, it must come to terms with the extent of its own jurisdiction. The Debtor has raised seven (7) separate causes of action against the Defendants and sought a jury trial as to each. In response, the Defendants filed a motion asking the District Court to withdraw the jurisdictional reference of the adversary proceeding from this Court. The Defendants reasoned that this Court had no jurisdiction to hear the matters because a jury trial was requested and the Defendants do not consent to the jury trial before the bankruptcy court.[1] The District Court (Gorton, J.) agreed to withdraw the reference, but ordered that "all pretrial matters [be] resolved in the Bankruptcy Court pursuant to MLBR 9015–1(c)." (Order dated April 14, 1999, hereinafter referred to as the "District Court Order").

▮ Pursuant to the District Court Order, the parties have completed discovery under the aegis of this Court. However, disposition of a motion for summary judg- ment requires that a court first examine its jurisdiction to ensure that it can make the determination requested. Bankruptcy Courts are courts of limited jurisdiction. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). As to matters delineated as "core," a bankruptcy court may make final determinations of fact and conclusions of law. Fact determinations are reviewed employing a "clearly erroneous" standard, while conclusions of law are reviewed de novo. Fed. R. Bankr.P. 8013; *see Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco International, Inc.)*, 132 F.3d 104, 107 (1st Cir.1997); *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir.1997); *see U.S. v. Clifford (In re Clifford)*, 255 B.R. 258, 263 (D.Mass.2000). But as to noncore matters, bankruptcy courts are precluded from making final determinations absent consent of the parties. 28 U.S.C. § 157(c)(2). The court may make proposed findings of fact and law, but those findings are afforded no special deference by the District Court. *See Monarch Life Ins. Co. v. Ropes & Gray (In re Monarch Capital Corp.)*, 173 B.R. 31, 35 (D.Mass.1994), aff'd, 65 F.3d 973, 980 (1st Cir.1995)(without the parties consent, a bankruptcy court may only issue proposed findings of fact and conclusions of law with regard to noncore matters). Both findings of fact and conclusions of law are reviewed by the District Court de novo. 28 U.S.C. § 157(c)(1); *see Arnold Print Works v. Apkin, (In re Arnold Print Works)*, 815 F.2d 165, 166 (1st Cir.1987).

1. 28 U.S.C. § 157(e) provides:

    If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all parties.

In the District of Massachusetts, bankruptcy judges are designated by the District Court to exercise the requisite jurisdiction. *See* L.R., D. Mass. 202. But the right to have the last word resides with the parties, and the Defendants have not consented to have the jury trial in the bankruptcy court.

The standard for allowance of a motion for summary judgment is well settled. In order for the moving party to prevail, it must demonstrate to the Court that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c) as made applicable by Fed. R. Bankr.P. 7056. The court must view the movant's arguments "scrutinizing the record in the light most flattering to the nonmovant and indulging all reasonable inferences in that party's favor." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994)(citing *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir. 1989)). The movant has the preliminary burden to demonstrate that no triable issue of fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)(stating that the movant bears the initial burden of "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). But if met, the burden then shifts to the nonmoving party to introduce evidence of a genuine issue of material fact. *FDIC v. Municipality of Ponce*, 904 F.2d 740, 742 (1st Cir.1990); *see also J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir.1996); *Staffier v. Sandoz Pharmaceuticals Corp.*, 888 F.Supp. 287, 293 (D.Mass. 1995) aff'd, 78 F.3d 577 (1st Cir.1996). If the non-moving party is unable to do so, summary judgment for the movant is appropriate. *See FDIC v. Municipality of Ponce* at 742 (citing *Celotex*). In defense of a motion for summary judgment, it is not sufficient for the opposing party to simply rely on evidence of "some combination of 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Maldonado* at 581 (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

■ Here, the Defendants contend that the Debtor has offered no genuine issue of material fact. The absence of such an issue ordinarily empowers a court to grant judgment notwithstanding a request by the nonmoving party for a jury trial. However, the authority to grant summary judgment presupposes that the Court had the power to decide the matter in the absence of a request for a jury determination. Accordingly, whether this Court has the authority to grant summary judgment, or is limited to submitting to the District Court proposed findings of fact and conclusions of law, is wholly dependent on whether the underlying dispute would implicate a bankruptcy court's core or noncore jurisdiction in the absence of a request for jury trial.

In 28 U.S.C. § 157(b)(2), Congress set forth the following non-exhaustive list of disputes over which a bankruptcy court has jurisdiction to render final determinations, labeling them core matters:

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims. ·

28 U.S.C. § 157(b).

■ Unfortunately, reliance on this list does not provide all of the answers. First, not only is the list non-exclusive, but some of the categories provided are painfully vague. *See, e.g.,* § 157(b)(A) and (O); *N. Parent Inc. v. Cotter & Co. (In re N. Parent Inc.),* 221 B.R. 609, 624 (Bankr. D.Mass.1998); *Noonan v. Cellu Tissue Corp. CST (In re Palmer Trucking),* 201 B.R. 9 (Bankr.D.Mass.1996). In *Ralls v. Docktor Pet Centers Inc.,* Judge Tauro provides additional guidance in his description of non-core issues as "state or federal claims that arise between parties within a bankruptcy proceeding... [which could] survive outside bankruptcy, and in the absence of bankruptcy, would have been initiated in a state or district court'". 177 B.R. 420, 424–5 (D.Mass.1995) (citations omitted). This Court agrees. Second,

while it is clear that matters otherwise noncore should be viewed as core if arising post-petition, it is less clear how to categorize a dispute based on events which commenced pre-petition but continued post-petition. *See In re Arnold Print Works,* 815 F.2d 165 (1st Cir.1987)(a majority of courts addressing the issue have held causes of action arising post-petition to be core). The better view is that claims arising pre-petition and continuing post-petition should be deemed noncore. *See generally Ralls v. Docktor Pet Centers, Inc.,* 177 B.R. 420 (D.Mass.1995); *N. Parent* at 625 (such matters are best categorized as noncore). Third, serious questions of judicial economy and the risk of inconsistent determinations arise where a single fact pattern commingles both core and noncore disputes. *N. Parent* at 629 (stating "[t]o have the have the parties try the same facts in different courts promotes neither judicial economy nor the efficient administration of the estate").

This Court dealt with several of these perplexing problems in the *N. Parent* case. There as here, the adversary proceeding stated multiple claims against the defendant, some core and some noncore. In order to properly address the issues raised, this Court found it necessary to "separately analyze [each claim] to determine whether it [fell] within the bankruptcy court's core jurisdiction". *Id.* at 626 (citing, *Docktor Pet Centers Inc.* at 425; *Hughes–Bechtol, Inc.v. Ohio (In re Hughes–Bechtol),* 141 B.R. 946, 949 (Bankr.S.D.Ohio 1992)). As in *N. Parent,* this Court will again follow the framework and policy established in both *Docktor Pet Centers* and *Palmer Trucking. See N. Parent* at 626 (adopting the standard set forth in *Docktor Pet Centers, Inc.* 177 B.R. 420, and *In re Palmer Trucking Co., Inc.,* 201 B.R. 9). In order to properly consider

each claim, the Court first turns to a recitation of the facts and travel of the case.

## II.  *Facts and Travel of the Case*

From October of 1991 through October of 1998, the Debtor operated a horror theme park in Berlin, Massachusetts on land held in a trust established and administered by the Debtor's principal and his spouse.  The park was singularly dedicated to the children's (young and old) holiday of Halloween.  From its rather simple beginnings in 1991, the business grew quickly.  The Park first opened with a "Haunted Hayride," a celebrity area and a small retail area housed in a brick building and a small wooden barn.  For the 1992 season, the Debtor added to the "Haunted Hayride" a "Savini Haunted House" situated in the rear of the barn.  In 1994, the Debtor added a metal building to accommodate a "museum display."  For the 1995 or 1996 season, the Debtor added a "Phantom Mine Shaft" in the lower portion of the barn, and for 1996 added an outdoor display, a "Cirque Macabre," which included juggling clowns, a contortionist and a "Mouse Lady."  In 1997, a steel building was erected to house a "3D Wax Museum." Because its business was centered on a single day of each year (October 31st), the Debtor annually operated for only 30 days, October 1 through October 30.  By 1998, the operations covered three buildings and employed approximately 500 people.

Construction of the steel building was of concern to the Town, and, while the basis of that concern is unclear, it is undisputed that no approved building permit for the interior sections was ever obtained.  Nevertheless, on September 30, 1998, the Building Inspector for the Town of Berlin, Lawrence Brandt, conducted his annual inspection of the premises.  Upon completion of his inspection, Brandt issued a Certificate of Occupancy for each of the buildings as he had in years past.  Accordingly, the Debtor opened for business on October 1, 1998.  However, on October 7, 1998, the Debtor received a letter from Brandt addressed to David Bertolino, the Debtor's principal, notifying him that the Certificates of Occupancy were rescinded for the Savini Haunted House and the Phantom Mine Shaft, on account of the Debtor's alleged failure to comply with the Massachusetts State Building Code. The stated code violation was a purported lack of appropriate sprinkler systems.[2]  Accordingly, certain buildings would have to be closed pending compliance.

The Debtor disagreed with the Town's determination and was particularly disturbed that any of its facilities would be shut down during its only month of yearly operations.  Substantial negotiations ensued, the details of which are in dispute.  Apparently, there was some discussion between counsel for the Debtor and Duncan Baum, the Assistant Fire Chief, regarding ways in which the Debtor might remain operating pending compliance with the Town's code requirements.  The possibility of the Debtor employing a fire watch[3] on the premises was discussed and the costs to the Debtor explored.  Whether or not the fire watch was a viable option and who was responsible for a breakdown in those negotiations are points of contention between the parties.

---

2.  According to the Town, the Code had been amended in the prior year to require those sprinklers.  The Debtor argues that the amendment is inapplicable to its business operations.

3.  According to the parties, a "fire watch" is constituted by the presence of firefighting personnel and equipment on the premises prepared to respond immediately in the event of a fire.

The Debtor also appealed the Town's actions to the State Board of Building Appeals, pursuant to M.G.L. c. 143, § 100. However, when, by October 16, 1998, the Debtor had still not closed the relevant attractions, the Town filed a complaint in state court, seeking a temporary restraining order, as well as daily monetary sanctions for noncompliance. The order was granted. The effect of the order was a shut down of a substantial portion of the Debtor's operations. In response, the Debtor filed the instant Chapter 11 case in this Court and resolved to continue its operations employing the benefits of the automatic stay. *See* 11 U.S.C. § 362(a).

On October 17, 1998, various Town representatives and a state police officer arrived at the Debtor's location and insisted upon the closure of the allegedly non-compliant buildings. They were advised by the Debtor's (now bankruptcy) counsel that their actions violated the automatic stay, however, they were not dissuaded from enforcing the state court injunction, and threatened to arrest violators.

The Debtor responded with a request to this Court to enjoin the Town, its fire department, its assistant fire chief, its building inspector and its selectmen from continuing to seek relief in the state court. The Town opposed, citing the police power exception from the automatic stay. *See* § 362(b)(4). At the hearing, the Town's counsel, Gary Brackett, represented that the condition of the premises posed an immediate danger to the safety and welfare of the Debtor's patrons and cited support from prominent state public safety officials. The Debtor disputed the factual assertions made by the Town. However, the Court ruled that § 362(b)(4) precluded consideration of the merits of the dispute, and that, if the Town's assertions were incorrect, it was for the state court to sort it out. On the same day, after a hearing at which the Town made similar representations which the Debtor disputed, the state court, converted its temporary restraining order to a preliminary injunction. The affected buildings did not reopen during October of 1998, and the Debtor terminated its business operations thereafter.

This adversary proceeding followed. The Debtor contends that the Defendants improperly shut down its business during the October 1998 season and misrepresented the underlying history, facts and circumstances, both to this Court and to the state court. Indeed, they argue that the Defendants incorrectly determined that the Debtor had violated the Massachusetts State Building Code, unreasonably exaggerated the risk to the public and actually misrepresented the statements made by and support received from state public safety officials. A careful review of the depositions taken by the Debtor do reveal various inconsistencies in the statements made by one or more of the Defendants in support of their actions.

III. *Classification of Core and Non–Core Claims*

■ The Debtor argues that the Defendants violated its civil rights under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and under the Massachusetts Civil Rights Act, M.G.L.A. 12 §§ 11H and I; unlawfully conspired to do so; violated the Debtor's right to equal protection under the Fourteenth Amendment to the United States Constitution; defamed the Debtor by slander and/or libel; and interfered with its contractual and/or advantageous business relationships, as well as prospective relationships. Those claims are not by their nature "core." Although related to the bankruptcy case insofar as a finding in the Debtor's favor would have an impact on the estate, they do not arise under the Bankruptcy Code itself and could survive

independently.[4] Furthermore, the Defendants' actionable conduct is alleged to have commenced before the filing of the petition and to have continued thereafter. Accordingly, all of these claims are non-core. 28 U.S.C. § 157(b).

The analysis is far different with respect to the Debtor's remaining claim that the actions of the Defendants violated the automatic stay and seeking damages under § 362(h) and § 105(a).[5] This claim arises under the Bankruptcy Code and not elsewhere. By definition, the operative events relating to a stay violation occur after the bankruptcy case filing. While § 157(b)(2) provides that "[c]ore proceedings include...(G) motions to terminate, annul, or modify the automatic stay", 28 U.S.C. § 157(b)(2)(G),

> [i]t is beyond dispute that proceedings brought pursuant to 11 U .S.C. § 362 are core. While § 157(b)(2)(G) relates only to 'motions to terminate, annul or modify the automatic stay,' it is obvious that motions to 'enforce' the automatic stay should enjoy the same status.

*In re N. Parent, Inc.* at 627.

In light of the preceding analysis, this Court rules that it does not have the jurisdiction to finally determine the Defendants' instant motion for summary judgment, with respect to any of the claims, save only those arising under § 362(a) of the Bankruptcy Code. This Court will, therefore, make rulings on the latter, but only proposed findings of fact and law and recommendations as to disposition of the former, in conformity with § 157(c)(1).

## IV. *Non–Core Claim Disposition*

### A. 42 U.S.C. § 1983

In order for a plaintiff to maintain an action under 42 U.S.C. § 1983, the court must analyze the claim using the two part test relied upon in *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Before addressing the conduct complained of, the court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right." *Id.* at 609, 119 S.Ct. at 1697. And next, "the court must proceed to 'determine whether that right was clearly established at the time of the alleged violation'". *See Abreu–Guzman v. Ford*, 241 F.3d 69 (1st Cir.2001)(quoting *Wilson v. Layne* for the Supreme Court's analysis of civil rights violations).

The Debtor claims that its § 1983 action arises from the Defendants' violation of the Debtor's right to due process and equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.[6] However, neither the Debtor's Complaint, Amended Complaint nor the Opposition to the Defendants' Motion for Summary Judgment clearly state the nature of the asserted due process or equal protection claims. Nevertheless, in an effort to cover all possible arguments (and perhaps grant more than the Debtor is due), this Court will address each of

---

**4.** *See Celotex v. Edwards*, 514 U.S. 300, 308, n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); *Xytest Corp. v. Mitchell (In re Mitchell)*, 255 B.R. 97, 107 (Bankr.D.Mass.2000).

**5.** The Debtor more clearly states the relied upon law both in their Opposition to Defendants Motion for Summary Judgment as well as in Debtor's counsel's open court statements of October 3, 2000 (Transcript p.35).

**6.** The Fourteenth Amendment provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

these facets of the Fourteenth Amendment in turn.

*Equal Protection*

■ In *Sunday Lake Iron Co. v. Wakefield Tp.*, the Supreme Court addressed the rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment as follows:

> The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.

247 U.S. 350, 352–53, 38 S.Ct. 495, 495, 62 L.Ed. 1154 (1918). In order to establish a § 1983 claim for equal protection violation, the "plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.1998) (citations omitted), cert. denied, 525 U.S. 1154, 119 S.Ct. 1058, 143 L.Ed.2d 63 (1999); *see Collins v. Nuzzo*, 244 F.3d 246, 251 (1st Cir.2001)(citing *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 832 n. 9 (1st Cir.1982), violation is demonstrated "upon a showing of a 'gross abuse of power, invidious discrimination, or fundamentally unfair procedures' or some sort of unjustified disparate treatment with respect to similarly situated applicants").

■ Here, the Debtor has not offered any evidence nor even argued that it should be considered part of some protected class. Nor has it even suggested that its treatment was in any way disparate from the treatment afforded to others similarly situated.

*Due Process*

■ The right to procedural due process requires that the party whose rights are being affected have notice and an opportunity to be heard. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *see also Fitzgerald v. Town of Kingston*, 13 F.Supp.2d 119, 123 (D.Mass.1998). It is not necessary "that notice and a hearing always take place *prior* to the governmental action, but only that a complaint be heard 'at a meaningful time and in a meaningful manner.'" *Fitzgerald* at 123 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). When a claimant has been provided with a meaningful opportunity to challenge the actions taken against it, regardless of whether the party avails itself of that opportunity, no procedural due process violation exists. *See Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 680 (3rd Cir.1991)(citing *Bello v. Walker*, 840 F.2d 1124 (3rd Cir.1988)).

■ In this case, although the state court temporary restraining order was obtained against the Debtor with little or no notice on October 16, 1998, the Debtor was afforded an opportunity to be heard in the state court on October 21st. The Debtor had an opportunity to argue its case before the state superior court within a matter of days, at which time that Court issued a preliminary injunction based on its interpretation of the arguments made by both parties and the law. If dissatisfied, the Debtor was free to seek reconsideration or state appellate review on an emergency basis. *See* M.G.L.A. c. 231, § 118. There is no evidence that the Debtor took any further steps in the state court proceedings. Having been afforded the opportunity to challenge the state court injunction, the Debtor's procedural due process right were not violated.

■■■■ Substantive due process requires that the governmental action, claimed to be in violation of the plaintiff's rights, be at least rationally related to a legitimate governmental interest. *See Collins v. Nuzzo* at 250 ("plaintiff must demonstrate an 'abuse of government power that shocks the conscience' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests' "); *see also Watson v. City of Kansas City, Kansas,* 80 F.Supp.2d 1175, 1190 (D.Kan.1999)(citing *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996)). "To establish a violation of [a] right to substantive due process, [one] must prove that the [governmental actor's] actions were 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " *Dodd v. Hood River County,* 59 F.3d 852, 864 (9th Cir.1995)(quoting from *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)); *see Armendariz v. Penman,* 75 F.3d 1311 (9th Cir.1996); *see also Bello* at 1129. The burden to establish that the governmental action has no substantial relation to public health and safety is on the plaintiff. *Dodd* at 864. "There is no denial of substantive due process if the question as to whether the government acted arbitrarily or capriciously is 'at least debatable.' " *Id.* (quoting *Clover Leaf Creamery Co.,* 449 U.S. at 469, 101 S.Ct. at 724).

■■■■ Here, the Debtor has failed to introduce evidence that the Defendants' actions were not motivated by their concern for public safety. However, the Debtor has raised genuine issues of material fact as to whether certain of the Defendants unreasonably exaggerated and/or intentionally misled others, including the state court, as to both the risk to the public and the support for their proposed action from certain officials. This Court has no doubt that the Defendants perceived the Debtor to have violated the state building code and were so concerned that they attempted to obtain a state court injunction in order to assure the public safety. But it is not enough that government have good intentions. It must also deal honestly with its citizens. In matters of contest, the government must always play by the rules. The Fourteenth Amendment to the United States Constitution (as, e.g., the first ten amendments) was borne out of a resolve that individuals be protected even from a well-meaning but overzealous government, more concerned with broad policy questions than individual rights. Its premise assumes that, in a truly free society, even appropriate governmental ends do not justify all governmental means. Seen in the light most flattering to the Debtor (the non-moving party), one or more of the Defendants intentionally misled state public safety officials and/or the state court in order to secure the injunctive relief which led to the cessation and insolvency of the Debtor's business operations.

However, even if the Debtor had made a plausible argument that it was denied procedural or substantive process, no federal district or circuit court has jurisdiction to provide a remedy. The Rooker Feldman doctrine operates to "prohibit[ ] federal district and circuit courts from reviewing state court judgments." *Sheehan v. Marr,* 207 F.3d 35, 39 (1st Cir.2000)(footnote omitted). Under the doctrine,

> [w]here a party did not actually present its federal claims in state court, Rooker–Feldman forecloses lower federal court jurisdiction over claims that are "inextricably intertwined" with the claims adjudicated in a state court. *See [District of Columbia Court of Appeals v.] Feldman,* 460 U.S. [462] at 483 n. 16, 103 S.Ct. 1303 [75 L.Ed.2d 206 (1983)]. A federal claim is inextricably intertwined with the state-court claims "if the feder-

al claim succeeds only to the extent that the state court wrongly decided the issues before it." *See Hill v. Town of Conway*, 193 F.3d 33, 39 (1st Cir.1999). *Id.* at 39–40; *see also In re Mitchell*, at 106–07; *Halvorsen v. Mendez (In re Mendez)*, 246 B.R. 141, 145–46 (Bankr.D.P.R. 2000). Any claim based on a violation of the Debtor's Fourteenth Amendment rights by virtue of inaccurate information provided by the Defendants to the state court—and accepted as true by state court—would necessarily turn on a finding that the state court erred in its decision. The District Court lacks the jurisdiction to review the claims made here because these claims are "inextricably intertwined" with those made in the state court. *See Feldman* at 483, 103 S.Ct. 1303. As such, the District Court has no jurisdiction to "review" the state court's determination. Accordingly, this Court recommends that the District Court grant summary judgment in favor of all of the Defendants on the Debtor's claims under 42 U.S.C. § 1983.

### B.  42 U.S.C. § 1985

■ The Debtor further alleges that the Defendants have conspired to violate their rights under federal law. *See* 42 U.S.C. § 1985. In order to maintain a claim under § 1985, the party asserting the violation must demonstrate to the court that there exists "(1) a conspiracy; (2) motivated by racial or other discriminatory animus; (3) for the purpose of depriving any person or a class of persons of the equal protection of the laws or of equal privileges and immunities under the law; (4) an overt act in furtherance of the conspiracy and (5) injury." *See Vertical Broadcasting, Inc. v. Town of Southampton*, 84 F.Supp.2d 379, 389 (E.D.N.Y.2000).

■ The Debtor has failed to introduce any credible evidence of racial or discriminatory animus toward the Debtor or its principals. Nothing in any affidavit or transcript supplied by the Debtor provides support for such a charge. Furthermore, the Supreme Court has declined to extend the protection of 42 U.S.C. § 1985 to "reach conspiracies motivated by economic or commercial animus," which is presumably what the Debtor contends, despite its failure to specifically identify its class. *United Broth. of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 838, 103 S.Ct. 3352, 3361, 77 L.Ed.2d 1049 (1983). As previously noted, it is not enough to simply rely on evidence of "some combination of 'conclusory allegations, improbable inferences, and unsupported speculation,'" to overcome a motion for summary judgment. *Maldonado* at 581. And, again, even if such evidence had been presented, the Rooker–Feldman Doctrine would bar jurisdiction to adjudicate the matter in the District Court. Accordingly, this Court recommends that the District Court grant summary judgment in favor of the Defendants on the Debtor's claims under 42 U.S.C. § 1985.

### C.  M.G.L.A. c. 12 § 11H and 11I

■ The Debtor's claim under M.G.L.A. c. 12 §§ 11H and 11I is similar to the Federal Civil Rights claimed under 42 U.S.C. § 1983. *See id.* In order to establish a civil rights violation under section 11I against any of the Defendants, the Debtor must demonstrate that its "(1) exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *See Swanset Development Corp. v. City of Taunton* 423 Mass. 390, 395, 668 N.E.2d 333, 337 (1996)(citing M.G.L.A. c. 12 § 11I).

■ The Debtor has failed to introduce sufficient compelling evidence of any alleged "threat, intimidation or coercion" by the Individual Defendants. The sole support for this element relied on by the Debtor are some of the Defendants' actions on October 17, 1998, in securing a police presence and threatening to arrest the Debtor's employees if they failed to abide by the state court temporary restraining order. This hardly presents the kind of improper actions reasonably contemplated by the Massachusetts Legislature in its enactment of the statute. Even were this Court to believe otherwise, success on this claim would necessitate review of the state court ruling upon which the Defendants' relied to support their actions. That review by the District Court would be barred by the Rooker–Feldman Doctrine. *See Sheehan* at 39–40. Accordingly, this Court recommends that the District Court grant summary judgment in favor of the Defendants on the Debtor's claims under M.G.L.A. c. 12 §§ 11H and 11I.

### D. Defamation and Interference with Contractual or Business Relationships

■ In order to demonstrate to the court a viable claim of defamation, the plaintiff must show: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Restatement (Second) of Torts, at § 558;

see also *Zereski v. American Postal Workers Union*, 1998 WL 1181769 (Mass.Super.).

■ In order to maintain an action establishing the intentional tort of interference with contractual or business relations, the complainant must demonstrate: "(1) the existence of a contract or business relationship which contemplated economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages." *See Swanset* at 397, 668 N.E.2d at 338 (drawing the standard from *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990)).

### 1. *The Town*

■ The Town of Berlin maintains that, regardless of the merits of the Debtor's claims, it enjoys governmental immunity from claims of intentional tort such as defamation and interference with contractual relations. This Court agrees. The Town of Berlin is an entity covered by M.G.L.A. c. 258 § 1. Chapter 258 was enacted to permit certain claims against such public entities. However, intentional torts were specifically excluded. *See* M.G.L.A. c. 258 § 10(c).[7]

### 2. *The Individual Defendants*

■ The Individual Defendants do not enjoy such broad immunity from intentional tort claims.[8] However, they are entitled to appropriate notice of the challenged

---

7. Section 258 § 10 states that "The provisions of sections one to eight, inclusive, shall not apply to:—
   (c)...libel, slander...[or] interference with advantageous relations or interference with contractual relations,".

8. The Individual Defendants argue that they enjoy a qualified immunity. However, under the facts here, the Court need not reach that issue.

statement and Debtor has not provided this Court with the statements it considers defamatory. The Individual Defendants must be given notice of the precise language on which the Debtor's claim is constructed. *See Phantom Touring Inc. v. Affiliated Publications,* 953 F.2d 724, 728 n. 6 (1st Cir.1992), cert. denied 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992); *Berard v. Town of Millville,* 113 F.Supp.2d 197, 201 (D.Mass.2000). Accordingly, this Court recommends that the District Court grant summary judgment in favor of the Defendants on the Debtor's claims in defamation.

■ The tort of interference with contractual or business relationships also calls for the demonstration of necessary elements, one being the intent to so interfere. *See Shafir v. Steele,* 431 Mass. 365, 369–370 727 N.E.2d 1140, 1143–1144 (2000) (citing the Restatement (Second) of Torts, at § 766A). Here, there is no evidence that the Individual Defendants' intended to interfere with the Debtor's contractual relationships. While the Debtor has raised genuine issues of material fact about whether the Town had the right to demand certain modifications to the building structures and whether certain of the Individual Defendants intentionally misled state public safety officials and/or the state court in order to secure the injunctive relief which led to the cessation and insolvency of the Debtor's business operations, there is no evidence that the those Individual Defendants intended anything other than to enforce the building code as they understood it. Nor has the Debtor demonstrated any reason why these Individual Defendants may have wanted to interfere with its third-party contracts or relationships. Accordingly, this Court recommends that the District Court grant summary judgment in favor of the Defendants on the Debtor's claims for intentional interference with the Debtor's contractual or business relationships.

## V. 11 U.S.C. § 362(a)

■ Finally, this Court turns to the claim with respect to which it has core jurisdiction, the a claim for violation of the automatic stay. Section 362(a) of the Bankruptcy Code provides for an automatic stay of various creditor actions against the debtor and the bankruptcy estate. Its purposes are clear. The statute is designed to provide debtors with a temporary respite from creditor actions, at least until the rights of debtors and their creditors can be properly determined; and to stop any creditor actions which would disrupt an orderly and uniform distribution of nonexempt assets to creditors of the same class. *See Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969, 975 (1st Cir.1997)(stating that "[t]he automatic stay is among the most basic of debtor protections under bankruptcy law"); *In re Rijos,* 263 B.R. 382, 387–89 (1st Cir. BAP 2001); *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 998 (4th Cir.1986)(Citing *Matter of Holtkamp,* 669 F.2d 505, 508 (7th Cir. 1982), for its description of the § 362 stay as "protect[ing] the debtor from an uncontrollable scramble for its assets").

■ In its Amended Complaint, the Debtor first sets forth a long recitation of facts, and then its "Theories of Recovery." Among the theories listed is one for violation of the automatic stay. In this respect, the Debtor says only: "This is an action against the defendants for violation of the automatic stay pursuant to the Bankruptcy Code which imposition (sic) of the 362(g)(4) exception to the automatic stay was imposed arbitrarily and in bad faith." Amended Complaint, ¶ 45. There is little the Court can learn from this statement. Clumsy sentence construction aside, the Debtor does not indicate which subsec-

tion(s) of 11 U.S.C. § 362(a) the Defendants are supposed to have violated. The Court can guess from the Amended Complaint that the Debtor's grievance has something to do with § 362(b)(4), since the Court referred to that section of the Bankruptcy Code in denying the Debtor's preliminary injunction on October 20, 1998. However, § 362(b) sets forth those actions to which the automatic stay does *not* apply. It is incumbent upon the Debtor (at least at this stage of the case) to specifically identify those actions of the Defendant to which the automatic stay *did* apply, and in doing so, to list the relevant section(s) of § 362(a). The Defendants' right to procedural due process demands nothing less.

The Debtor is more explicit in its "Opposition to Defendant's Motion for Summary Judgment" (the "Debtor's Opposition"), but still misses the mark. The Debtor's Opposition contains an extended discussion of three topics. First, the Debtor argues that, notwithstanding language in § 362(h) that appears facially to limit sanctions to individual debtors harmed by violations of the automatic stay, this Court should extend the remedy to corporate debtors as well. Second, the Debtor maintains that perceived ambiguity in the language of the present version of § 362(b)(4) precludes the entry of summary judgment in favor of

the Defendants.[9] And third, the Debtor contends that § 362(b)(4) is inapplicable because the Defendants acted in "bad faith." But even here, the Debtor does not specifically identify which of the Defendants' actions violated § 362(a) and which subsections of § 362(a) are in play.

■ Nevertheless, going further than the Court must (or perhaps should) go, the Court's cobbling together of the Debtor's facts and arguments, viewed in the light most flattering to its cause, may very well raise a genuine issue of material fact as to whether at least one of the Individual Defendants misrepresented facts to this Court, relative to the extent of the violation of the state building code, the risk to the public and the support of state public safety officials. The Debtor's argument, while inartfully crafted, may be that the continuation of the state court proceeding was a violation of § 362(a)(1).[10] Nonetheless, even with the benefit of this Court's decryption, the arguments made by the Debtor do not avoid the consequence of summary judgment in favor of the Defendants.

First and foremost, the Debtor' submissions to the Court, both oral and written, are devoid of information which would negate the impact of § 362(b)(4). That sec-

---

9. The Court dismisses this argument out of hand. First, as set forth below, the applicable statute is not the present, but the earlier version of § 362(b)(4). There is no evidence to suggest that Congress intended the 1998 amendment of the statute, which became effective on October 21, 1998, the day after the hearing on this matter, to apply retroactively to pending cases. Second, the changes made by Congress are immaterial to the issues raised here. And third, even if the new statute applied and was ambiguously worded, that would not interfere with this Court's determination of the Defendants' summary judgment motion. Genuine ambiguities of material *fact*, not ambiguities of *law*, preclude the entry of summary judgment.

10. 11 U.S.C. § 362(a)(1) provides:

(a) Except as provided in subsection (b) of this section, a petition ... operates as a stay, applicable to all entities, of—
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

tion provided, as of the date of case commencement:

> (b) The filing of a petition ... does not operate as a stay—
>
> (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

11 U.S.C. § 362(b)(4).

■ The Debtor argues that § 362(b)(4) does not apply where the actions under review are conducted in bad faith. The Debtor is correct that there are limitations or, better said, qualifications to the breadth of § 362(d)(4). In *In re Mohawk Greenfield Motel Corp.*, this Court addressed the applicability of the automatic stay when a governmental entity acts in the exercise of its police power. 239 B.R. 1 (Bankr.D.Mass.1999). This Court examined the actions taken by the Massachusetts Commission Against Discrimination ("MCAD") under a two prong test applied by some of the relevant cases. Under the first, the pecuniary purpose test, the governmental body's actions must be evaluated in order to determine whether the primary motive behind the action was to protect the public safety and welfare or to advance the governmental body's interest in the debtor's property. *See In re Dunbar*, 235 B.R. 465, 470 (9th Cir. BAP 1999), aff'd, 245 F.3d 1058 (9th Cir.2001) (citations omitted). Under the second, the public policy test, the court must "distinguish[ ] between those proceedings that effectuate public policy and

those that adjudicate private rights." *Id.* at 471 (citing *Universal Life Church*, 128 F.3d at 1299 (9th Cir.1997) and *In re Charter First Mortg., Inc.*, 42 B.R. 380, 383 (Bankr.D.Or.1984)).[11] Here, the Town and its agents, the Individual Defendants, pass both tests easily. The affidavits and transcripts provided by both the Debtor and by the Defendants, uniformly present a picture of a governmental body and its agents concerned about the safety of town residents and other invitees to the Debtor's business premises and their perception that the Debtor had not met public safety regulations. Section § 362(b)(4) was crafted to preclude the application of the automatic stay to an exercise of police power in the service of public safety and welfare. *See Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 39–40, 112 S.Ct. 459, 464, 116 L.Ed.2d 358 (1991); *In re Mohawk Greenfield Corp.*, 239 B.R. at 7; *In re Herrera*, 194 B.R. 178, 184–5 (Bankr. N.D.Ill.1996).

■ Of course, "bankruptcy courts are [not] without power to prevent a governmental unit's bad-faith exercise of its police or regulatory power against the estate." *Javens v. City of Hazel Park (In re Javens)*, 107 F.3d 359, 366 (6th Cir.1997). "Congress removed local regulation only from the effect of the automatic stay; it did not eliminate the bankruptcy court's power to enjoin the enforcement of local regulation which is shown to be used in bad faith." *In re National Hospital and Institutional Builders Co.*, 658 F.2d 39, 43

---

11. The legislative history of section 362(b)(4) states that:

> [T]he stay under section 362(a)(1) does not apply to affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. This section is intended to be narrowly construed, in

order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.
  H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), reprinted in 1978 U.S.C.C.A.N. 5963; 1977 WL 9628 (Leg.Hist.).

(2nd Cir.1981)(decided under former Bankruptcy Act). State or local governmental action should be presumed to be undertaken in good faith, but that presumption can be overcome where the estate representative demonstrates that the government seeks to enforce a law that is flagrantly and patently unconstitutional; that the government is biased; that the government acted in wilful disregard of the law; that the government clearly abused its discretion in initiating proceedings against the estate representative; or that the proceeding initiated by the government is or was motivated by a desire to harass, by ill will, or by any other improper motivation. *Id.* at 43 (citations omitted).

Here, the Debtor has identified a number of specific instances of conduct, including intentional misrepresentations to this Court, as evidence of the Town's bad faith in this case. But again, the Debtor is far too general and conclusory in its approach. The Debtor has succeeded in demonstrating that there are genuine issues of material fact as to the accuracy of some of the Individual Defendants' statements to this Court and whether the Defendants correctly interpreted state law when they sought the closure of the Debtor's facilities. However, the Defendants made many more representations to this Court then were necessary to get the result achieved on October 20, 1998. It would have been more than enough had the Town averred, in good faith, that the Debtor's operations violated its interpretation of the state building code and, in light of the

public safety concerns, the automatic stay did not preclude the state proceedings brought by the Town, pursuant to § 362(b)(4). The Debtor's argument that the Defendants misread or misinterpreted state law was a matter for the state court to consider, so long as the Defendants intended in good faith to apply state law. And the Debtor has failed to demonstrate any other motivation or pretext for the Defendants' actions. Accordingly, the ongoing state court proceedings did not violate the automatic stay. The automatic stay was simply not applicable. If certain of the Defendants made misrepresentations to this Court on issues collateral to those necessary to decide the application of § 362(b)(4), those should be presented as violations of Rule 9011 of the Federal Rules of Bankruptcy Procedure and not as violations of the automatic stay, where, in the absence of the statements, the Court would have ruled no differently.[12]

Accordingly, this Court rules that the Debtor has demonstrated no genuine issue of material fact which would preclude this Court awarding summary judgment to the Defendants. And, therefore, this Court need not reach the question of whether § 362(h) permits the imposition of sanctions in favor of corporate bankruptcy debtors.

## III. CONCLUSION

For the foregoing reasons, this Court rules that the Debtor's claims for violation of the automatic stay under § 362(a) are core proceedings under 28 U.S.C. § 157(b);

---

**12.** This Court does not intend to minimize in any way the serious nature of the Debtor's allegations that intentional misrepresentations were made to this Court, particularly with respect to those statements and insinuations of support by state public safety officials. Intentional misrepresentations made to a bankruptcy judge have implications under Fed. R. Bankr.P. 9011 and are fodder for

inquiry by federal and state bar disciplinary bodies. Accordingly, nothing herein is intended to preclude any properly supported motion which the Debtor might file in the future under Rule 9011 on account of the statements alleged to have been improperly made in support of the Town's argument urging the inapplicability of the automatic stay.

**20**

and, accordingly, grants the Defendants' motion for summary judgment with respect to those claims. With respect to the balance of the claims made by the Debtor, this Court rules that such claims are non-core. Accordingly, this Court submits the foregoing to the District Court as its findings of fact and law, and respectfully recommends that the District Court grant summary judgment to the Defendants on those claims as well.